**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**
**CLARKSBURG**

**UNITED STATES OF AMERICA,**

                    **Plaintiff,**

**v.**                              **Criminal Action No.: 1:18-CR-46-7**
                                          **(JUDGE KLEEH)**

**CODY BOLEY,**

                    **Defendant.**

## REPORT AND RECOMMENDATION RECOMMENDING DEFENDANT'S MOTION TO SUPPRESS BE DENIED

This matter comes before the undersigned pursuant to the District Court's order (ECF No. 323) referring Defendant Cody Boley's Motion to Suppress Vehicle Stop and the Fruits Thereof ("Motion to Suppress"), filed on November 26, 2018, by and through his counsel James B. Zimarowski, Esq. (ECF No. 322). By order of Honorable Senior District Judge Irene M. Keeley, this case was reassigned to the Honorable District Judge Thomas S. Kleeh on December 1, 2018. (ECF No. 344).

On November 28, 2018, the Court directed Mr. Zimarowski to file a Memorandum of Law in Support of his motion. (ECF No. 326). Mr. Zimarowski filed a Memorandum of Law in support of his motion on December 3, 2018. (ECF No. 347). The United States of America through Assistant United States Attorney, Zelda Wesley, filed a Response to Defendant's Motion to Suppress on December 10, 2018. (ECF No. 371). A motion hearing on this matter was held before the undersigned on December 14, 2018. Following the hearing, the Defendant filed a Supplemental Memorandum with attachments on December 17, 2018. (ECF No. 384). This matter is now ripe for the undersigned to issue a Report and Recommendation to the District

Judge. For the reasons set forth herein, the undersigned **RECOMMENDS** Defendant's Motion to Suppress (ECF No. 322) be **DENIED**.

## I.     ISSUES PRESENTED

The issues presented herein are as follows: (1) Whether Deputy Lopez possessed the necessary reasonable, articulable suspicion to extend the traffic stop beyond the reason for its inception to allow a K-9 to arrive on scene; and (2) Whether Deputy Lopez's failure to read the Defendant his *Miranda* rights renders the Defendant's statements inadmissible during the traffic stop and in an interview conducted five days later with ATF agents.

## II.     BACKGROUND

On May 17, 2018, Deputy Zachary Lopez initiated a traffic stop on East Third Street in Weston, West Virginia on a "2006 Toyota Camry" because the vehicle did not have an inspection sticker. (ECF No. 384-1 at 2). Upon approaching the stopped vehicle, Deputy Lopez began speaking with the driver, who was later identified as Cody Boley, the Defendant, a front seat passenger identified as April Redina, and a back seat passenger later identified as Robert Dennison. Id. at 2, 5. Officer Lopez noticed that Mr. Boley "appeared to be confused and extremely nervous." Id. Deputy Lopez then requested "Sergeant Laulis with the Harrison County Sheriff's Department and his K-9." Id. at 2.

After arriving on scene and deploying his K-9 around the vehicle, the K-9 indicated a positive alert for the presence of an illegal substance in the vehicle. Id. A subsequent search of the vehicle "yielded approximately 7.45 grams of a crystal substance which was distributed in 5 different clear bags, five (5) oblong white pills with 377 imprint, two (2) circular green pills with 230 imprint, small bag of Marijuana, packaging materials, drug paraphernalia, two (2) digital scales and a firearm." Id.

As a result of the search, both Cody Boley, the driver and Defendant in this matter, as well as passenger April Redina, were arrested for possession with intent to deliver a controlled substance (methamphetamine). Id. at 5. Mr. Boley was also found to have an "outstanding warrant from Harrison County for a property related offense." Id. at 10. Back seat passenger, Robert Dennison was further found to have an "active capias" for his arrest and was subsequently taken to the Lewis County Sheriff's Department to conduct a voluntary interview regarding his knowledge of the incident and "other drug related activities in the area." Id. at 9.

Subsequently, Cody Boley was indicted by the Clarksburg Grand Jury on September 18, 2018 on Four Counts of a Forty Count Indictment involving several other defendants relating to a conspiracy to distribute methamphetamine. Mr. Boley's charges stem from the traffic stop on May 17, 2018, and his possession of a firearm while in the possession of controlled substances. (ECF No. 1 at, 1-2, 26-28).

## III.     SUMMARY OF TESTIMONY

During the December 14, 2018, suppression hearing, the Court heard the sworn testimony of Government witnesses, Lewis County Police Department Deputy Zachary M. Lopez and Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") Agent Steve Worthy. The Court also received into evidence Government's Exhibit 1, the body camera footage of Deputy Zachary Lopez (original disc on file with Clerk's Office) and Defendant's Exhibits 1 through 4 (ECF No. 383-1 through 4), still images from the body camera footage showing various time stamps throughout the traffic stop on May 17, 2018.

### A. Testimony of Deputy Lopez

Deputy Zachary Lopez is employed as a Deputy Sheriff with the Lewis County Sheriff's Office.[1] He has worked with the Lewis County Sheriff's Office for five years and two months. He was employed with the Lewis County Sheriff's Office on May 17, 2018. On this day, Deputy Lopez initiated a traffic stop on a "gold Sedan" when he "observed a green object where there should have been an inspection sticker." In 2018, the West Virginia inspection sticker should have been "blue in color." (1:15:09 – 1:15:45). Deputy Lopez testified that he was wearing his uniform and was driving in a "marked vehicle." Deputy Lopez stated he put his emergency lights on and pulled this vehicle over in Weston, West Virginia, on East Third Street. After he pulled the vehicle over, Deputy Lopez testified that he approached and noticed there was a "dollar bill" where a valid West Virginia inspection sticker should have been located. (1:15:58 – 1:16:12).

Deputy Lopez testified that he noticed the occupants of the vehicle were "nervous." (1:16:10-20). Deputy Lopez identified the driver of the vehicle as a Cody Boley. (1:16:20-23). When he first approached the vehicle, Deputy Lopez requested Mr. Boley's driver's license, registration, and insurance. Deputy Lopez testified that Mr. Boley stated he did not know where this information was and further stated that his name was "Harley." (1:16:28-42). About a "couple minutes later" the driver "advised that his name was Cody Boley." (1:16:30-47). Deputy Lopez stated Mr. Boley admitted that his real name was Cody Boley and he did not have a driver's license. Because of this, he first gave the name of "Harley", because he believed his brother Harley did have a valid driver's license. (1:16:56-1:17:05).

Deputy Lopez further testified there was a female in the passenger seat of the vehicle and another male in the back seat behind the passenger. Deputy Lopez noticed there was a "T.V." in

---

[1] All citations herein relate to the Audio Recording of the Motion Hearing held on December 14, 2018, found on FTR Gold.

the back seat of the vehicle. (1:17:15-29). As Deputy Lopez spoke with Mr. Boley, he noticed that Mr. Boley "wouldn't make eye contact" and was "picking scabs" around his knee. (1:17:42-52). Deputy Lopez testified that, in his experience, the act of "picking scabs" is typically associated with individuals who are "needle users of methamphetamine." (1:18:15-25). After noticing this behavior, Deputy Lopez asked Mr. Boley to step out of the vehicle. Deputy Lopez asked Mr. Boley if he was wanted for any crimes to which Mr. Boley advised "not that he knows of." Mr. Boley further advised that he was not the owner of the vehicle he was driving. (1:19:04-15).

Deputy Lopez testified that he asked Mr. Boley to exit the vehicle because Mr. Boley stated he did not have a driver's license, he was nervous, would not make eye contact, "picking scabs", and believed he "looked confused." (1:19-30-45). Deputy Lopez advised Mr. Boley he could be arrested for obstructing because he provided a false name. Deputy Lopez testified Mr. Boley and the occupants of the vehicle were "not free to leave" because he did not have a driver's license and the vehicle was not legally permitted to operate on the road because it did not have an inspection sticker. (1:20:00-1:20:25).

Deputy Lopez then contacted dispatch and asked for them to run "an NCIC" for individuals occupying the vehicle. While Deputy Lopez did not initially know the name of the occupant in the back of the vehicle, the occupant later identified himself as "Robert Dennison" to Deputy Vanmeter. After running the individuals through NCIC, Deputy Lopez called for a K-9 unit. Deputy Lopez testified that he called for the K-9 due to the Defendant not having a driver's license, exhibiting signs of nervousness, and because he was picking at scabs. Deputy Lopez first contacted Lewis County who did not have a K-9 available. Deputy Lopez then contacted Upshur

County who also did not have a K-9 available. The next closest available K-9 unit was from Harrison County, W.V. (1:21:55-1:22:10).

Deputy Lopez testified that he was wearing his body camera throughout the traffic stop and that he had an opportunity to view the footage obtained by the body camera footage. The Government then moved for the admission of the body camera footage into evidence and published the footage obtained by the body camera footage. There was no objection by the Defendant to the admission or publishing of the body camera footage. The Government sought to play "three portions" of body camera footage in their entirety, however, the Government did not play the entire body camera footage because there were portions that were not relevant.

Upon learning of this information, the Defendant objected to the evidence under the "Rule of Completeness" to which the Government advised that it was playing the portions that it believed were "most relevant" under Rule 401 and further advised the Court that the Defendant had a complete copy of the body camera footage and was free to supplement the evidence as he saw fit. The Court then allowed for the admission of the Government's exhibit and allowed the body camera footage to be played before the Court. However, the Court ordered a complete copy of the footage be submitted into evidence for its benefit.

The Government continued to periodically ask Deputy Lopez questions relevant to what was being portrayed during the playing of the body camera footage. When asked what his impression of Mr. Boley "picking scabs" while he asked him routine questions, Deputy Lopez stated he believed it was consistent with the use of methamphetamine. (1:32:26 – 1:32:33). During playing of the body camera footage, in the first few minutes of Deputy Lopez's initial encounter with the Defendant and the occupants of the vehicle, Deputy Lopez can be heard asking the Defendant for consent to search the vehicle and after Mr. Boley advised that he could

not, Deputy Lopez calls for a K-9 unit. (1:30:57 – 1:33:56). Deputy Lopez advised the Defendant that he would "probably take him to jail for obstructing" and then ordered the occupants of the vehicle to step out of the car and advised them they were being detained. (1:33:58 – 1:34:12).

Deputy Lopez can then be heard stating to another officer on scene that they were going to "run them for warrants" and "get the dog" and then they would "tow the vehicle." (1:34:59 – 1:35:22). During the body camera footage, it could be seen that another Officer on scene removed a "soda can" from the vehicle. This was done upon the request of the "passenger in the back" because he "wanted a drink." Deputy Lopez testified that at this time "no one was searching the vehicle." (1:38:41 – 1:39:00). Deputy Lopez further stated that at this time during the stop, the officers were still "waiting on the NCIC check to come back." (1:39:10 – 16). In the body camera footage, Deputy Lopez asked if "anyone was able to drive" and again advised that the officers would "probably tow it."

Deputy Lopez can be heard asking the occupants of the vehicle, "whose lockbox is in the front seat" (1:41:20 – 35) to which Mr. Boley advised that it had "knives in it." (1:41:38 – 45). When asked what he thought about the lockbox, Deputy Lopez testified that he has observed when individuals travel with a lock box or safe, they are typically travelling with drugs or money. (1:41:50 – 1:42:08).

In the body camera footage, Deputy Lopez can be heard asking the occupants of the vehicle, "where is the firearm." (1:42:15 – 1:42:30). Deputy Lopez testified that that "Robert Dennison advised Deputy Vanmeter there was a firearm in the vehicle." (1:42:33 – 50). Deputy Lopez testified that at the point he had knowledge of the firearm, he was "still waiting for the NCIC check to come back on these individuals." (1:43:25 – 40). Deputy Lopez then asked the Defendant for permission to remove the firearm from the vehicle to which Mr. Boley advised

"you can grab it if you want." (1:43:45 – 55). Deputy Lopez testified that he considered this to be consent for him to remove the firearm from the vehicle. (1:44:00 – 09). Deputy Lopez and the officers on scene then initiated an NCIC check to see if the firearm was stolen. (1:48:30 – 46).

The body camera video and testimony from Deputy Lopez revealed that the "back seat passenger", Robert ("Bobby") Dennison had initially lied to the officers about his identification as well, providing them with a false name. The officers later discovered that there was a "capias" out for Mr. Dennison's arrest from Harrison County (1:50:45 – 1:51:40).

However, at this point in time in the body camera footage, when the officers learned of Mr. Dennison's real name, the officers were still waiting for the results of the NCIC check to come back. During this time, the officers called the El Paso Intelligence Center "EPIC" to check if the occupants were involved in any ongoing investigations for criminal activity. (1:53:00 – 1:54:32).

The K-9 arrived on scene and provided a positive alert to the presence of controlled substances after conducting a sniff of the vehicle. (2:04:55 – 2:05:05). The officers then conducted a search of the vehicle which yielded the evidence as noted above. *See supra* Section I. Background, paragraph two.

Deputy Lopez testified that Mr. Boley never took off his sunglasses during the traffic stop and therefore, he was never able to determine if his eyes were blood shot. The lockbox and television were removed from the vehicle and Deputy Lopez testified that both items were observable at the time of his initial contact with the vehicle. (2:16:05 – 16). Deputy Lopez testified that Cody Boley, the Defendant, and passenger April Redina were both arrested following the search of the vehicle. Robert "Bobby" Dennison, the back-seat passenger, was also arrested and transported away for questioning. (2:23:25 – 2:23:50).

Counsel for the Defendant, James Zimarowski, Esq., then conducted cross examination of Deputy Lopez. Mr. Zimarowski noted that there were no "time stamps" in the officer's report and asked if this was common practice. Deputy Lopez stated that he did not contribute to the police report but did prepare the criminal complaint.

Counsel for the Defendant then presented Defendant's Exhibits one through four, still images from the body camera footage of Deputy Lopez showing various time stamps throughout the stop. Defendant's Exhibit one contained a time index of "15:24", Exhibit two had a time index of "15:29", Exhibit three had a time index of "15:35", and Exhibit four had a time index of "16:14." (2:26:30 – 2:27:30). It was noted that the body camera times were not necessarily correlated to the actual time during the stop; rather, the Defendant was offering these exhibits to establish the lapse of time throughout the stop of the Defendant. At "15:29", Defense Counsel stated the image showed the Defendant was in "hand cuffs" and Deputy Lopez advised he was "not free to leave." Deputy Lopez advised that he had not, at that time, advised the Defendant of his *Miranda* rights. However, Deputy Lopez testified that Defendant was not under arrest at that time but was detained.

Through these exhibits, Defense Counsel established that approximately "50-55 minutes" had elapsed during the traffic stop at the time the drug dog arrived and probable cause to search the vehicle was established. (2:32:30 – 42). Defense Counsel asked Deputy Lopez if a citation had been written for "an invalid inspection sticker" and Deputy Lopez testified there was not. (2:32:43 – 2:33:00). Deputy Lopez testified that he has never taken "55 minutes to write a citation for an invalid inspection sticker." However, Deputy Lopez testified that the speed at which he receives responses back from NCIC on individuals often varies. Deputy Lopez testified

that he did not arrest Mr. Boley for having an invalid driver's license. Deputy Lopez further testified that he did not advise Mr. Boley of his *Miranda* rights.

Deputy Lopez testified that he could not approximate a time at which the results of the NCIC check came back. However, although he could not approximate the time it happened, Deputy Lopez testified that information did come back showing Mr. Boley did not have a valid driver's license, did not have a valid inspection, and that the car was not registered in Mr. Boley's name. Deputy Lopez testified that he did not issue a citation to Mr. Boley for an invalid inspection sticker or for lack of an operator's license.

The Government then conducted redirect of Deputy Lopez. Based upon his observations, Deputy Lopez testified he ordered the Defendant out of the vehicle, detained him, and requested the K-9 unit. Deputy Lopez testified that while he did not read the Defendant his *Miranda* warnings, he never questioned or conducting any interrogation of the Defendant that would have required the warnings. Deputy Lopez further testified, that although he did not issue citations for the traffic offenses, this was because the scope of the investigation of his stop changed throughout the course of the stop based on his observations and Mr. Boley was ultimately arrested on other charges. In other words, Officer Lopez testified that the stop became more than one directed only at an invalid inspection sticker and lack of a valid driver's license due to the nature of his interactions with the Defendant and the occupants of the vehicle as well as the information gathered throughout the stop. (2:47:50 – 2:48:30).

**B. Testimony of Government Witness Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") Agent Steve Worthy.**

The Government then called as its witness, ATF Agent Steve Worthy. (2:49:45). Agent Worthy testified that he has worked for ATF since January of 2016. At the time of the Defendant's arrest, Agent Worthy testified that he and other officers were working an active

investigation in which the Defendant was a target. (2:50:30 – 38). Upon learning of the arrest of Defendant Cody Boley, Agent Worthy travelled to the regional jail to interview him. This was approximately five days after the traffic stop of May 17, 2018.

ATF Agent Worthy had interviewed Mr. Boley previously due to other charges. At the time he interviewed Mr. Boley at the jail, ATF Agent testified that he read Mr. Boley his *Miranda* rights and Mr. Boley executed a waiver indicating he understood his rights and expressed a desire to answer questions. Mr. Boley further advised that he was willing to have his statement recorded. (2:52:00 – 35). During the interview, Mr. Boley advised that he was pulled over because he had a dollar bill taped to his window in place of an inspection sticker. During the stop, a K-9 arrived and alerted on his vehicle for which a subsequent search was conducted yielding methamphetamine and a firearm. Mr. Boley admitted that he owned the firearm. While Mr. Boley did not admit to owning all the methamphetamine found, he did admit to being in possession of methamphetamine found in the driver's side door that was for his "personal use." (2:53:36 – 2:54:30).

Mr. Zimarowski conducted cross-examination of Agent Worthy. Agent Worthy confirmed that the reason for his interview of the Defendant was because of the traffic stop on May 17, 2018. (2:54:42- 2:55:00).

## IV.    CONTENTS OF THE PARTIES

### A.  Defendant's Motion to Suppress

The Defendant contends the search and seizure of evidence against the Defendant during the May 17, 2018 traffic stop was in violation of his Fourth Amendment rights. The Defendant contends that the length of the stop, primarily its extension to allow for a K09 to arrive on scene and conduct a sniff of the vehicle, was unreasonable. (Def's Mot., ECF No. 322, at 3). The

Defendant further contends the search and seizure was unreasonable because the Defendant did not consent to a search of his vehicle and Defendant argues that Lewis County Sheriff's Department Deputies conducted "an unauthorized search" prior to the K-9's arrival. Id. at 2. Defendant also argues that, because he was never advised of his *Miranda* rights during the stop, any statements made by the Defendant to the officers should also be suppressed. Id. at 3.

In his Memorandum of Law in Support of Motion to Suppress Vehicle Stop and the Fruits Thereof ("Def's Memo in Supp.") (ECF No. 347), Defendant reiterates his argument that the traffic stop of the defendant lasted "longer than was necessary given its purpose" and that there was no "reasonable suspicion" present to extend the stop beyond its initial purpose to allow for a K-9 unit to arrive on scene. (Def's Memo in Supp., ECF No. 347, at 1-2). Defendant further argues that any statements made by the Defendant during the traffic stop, absent a *Miranda* waiver, should be suppressed. Id. at 2. Defendant also argues that his subsequent statements made in an interview with ATF agents should further be suppressed as a "fruit of the poisonous tree" because the interview pertained to the "illegally seized evidence" found during the May 17, 2018 traffic stop. Id. at 3.

### B.  Government's Response

The Government argues that the stop was lawful at its inception and was properly extended. The Government contends the "defendant's vehicle was lawfully stopped for a traffic violation which was extended as a result of the officer's articulable reasonable suspicions of criminal activity." (Gov't Response, ECF No. 371, at 2-3). The Government further contends that the "positive alert by the K-9 drug dog" gave the officers probable cause to search the Defendant's vehicle. Id. at 3. The Government also argues that Defendant's subsequent statements to law enforcement "on May 22, 2018 was voluntary" because the statement occurred

"five days following his arrest on May 17, 2018" and Defendant "executed a waiver of rights form, and agreed to have his statement recorded." Id.

### C. Defendant's Supplemental Brief

In a Supplemental Brief filed by the Defendant on December 17, 2018 (ECF No. 384) after the Motion Hearing on December 14, 2018, the Defendant argues there was no articulated "reasonable suspicion" and the officer "was not concerned with ending the traffic stop" but rather, was "only concerned with prolonging the unlawful seizure of the Defendant." (Def's Supp. Brief, ECF No. 384, at 1-2). The Defendant further argues that no "DRE protocols (Drug Recognition Expert) or even alcohol protocols" were administered "to support their suspicions that the Defendant was under the influence of controlled substances." Id. at 2. Defendant attached the Criminal Complaint to his Supplemental Brief for the Court's consideration. (ECF No. 384-1).

## V.    LEGAL ANALYSIS

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "Stopping an automobile and detaining its occupants constitute a 'seizure' within the meaning of the [Fourth and Fourteenth] Amendments . . ." Delaware v. Prouse, 440 U.S. 648, 654 (1979). A law enforcement officer is permitted to stop a vehicle when he or she sees that vehicle violate a traffic law. See United States v. Ortiz, 669 F.3d 439, 444 (4th Cir. 2012); See also United States v. Palmer, 820 F.3d 640, 649 (4th Cir. 2016) (A traffic stop is reasonable in its inception "whenever it is lawful for police to detain an automobile and its occupants pending inquiry into a vehicular violation. Without question, such a violation may include failure to comply with traffic laws.") (internal citation and quotation omitted).

### A.  The undersigned finds Deputy Lopez's stop of Defendant's vehicle was reasonable in its inception.

It is undisputed by the parties that the Defendant was driving his vehicle without a West Virginia Inspection sticker, and had, instead, a "dollar bill" where a valid inspection sticker should have been located as required under West Virginia law. Hence, Deputy Lopez initiated a traffic stop on the Defendant's "gold Sedan" when he "observed a green object where there should have been an inspection sticker." In 2018, the West Virginia inspection sticker should have been "blue in color." (*See* Audio Recording of Mot. Hearing, FTR Gold, at 1:15:09 – 1:15:45). Therefore, there is no question that Deputy Lopez was justified in stopping the Defendant's vehicle for the violation of a traffic law and the stop was certainly reasonable at its inception.

Pursuant to a traffic stop, "a police officer may 'request a driver's license and vehicle registration, run a computer check, and issue a citation.'" United States v. Branch, 537 F.3d 328, 335 (4th Cir. 2008) (quoting United States v. Foreman, 369 F.3d 776, at 781 (4th Cir. 2004)). "A canine sniff is also constitutionally acceptable if performed within 'the time reasonably required' to issue a traffic citation." Branch, 537 F.3d at 335 (quoting Illinois v. Caballes, 543 U.S. 405, at 407, 410 (2005)). A dog sniff "is not a search within the meaning of the Fourth Amendment and it therefore requires no additional justification." Branch, 537 F.3d at 335-36 (quoting Caballes, 543 U.S. at 408-09); *see also* United States v. Place, 462 U.S. 696, 707 (1983)). Further, police officers conducting a traffic stop may order the driver and "passengers to get out of the car pending completion of the stop." Md. v. Wilson, 519 U.S. 408, 415 (1997)

Hence, the "maximum acceptable length of a routine traffic stop cannot be stated with mathematical precision." Branch, 537 F.3d at 336. Rather, the "appropriate constitutional inquiry is whether the detention lasted longer that was necessary, given its purpose." Id. (citing Florida

v. Royer, 460 U.S. 491, 500 (1983) (plurality opinion)). As a result, "once the driver has demonstrated *he is entitled to operate his vehicle*, and the police officer has issued the requisite warning or ticket, the driver 'must be allowed to proceed on his way.'" Id. (quoting United States v. Rusher, 966 F.2d 868, 876 (4th Cir. 1992) (emphasis added)). However, "if the ***driver obstructs*** *the police officer's efforts in any way* - - *for example, by* ***providing inaccurate information*** - - *a longer traffic stop would* ***not be unreasonable***." Id. (quoting United States v. Sharpe, 470 U.S. 675, 687-88 (1985) (emphasis added)).

"If a police officer wants to detain a driver beyond the scope of a routine traffic stop, however, he must possess a justification for doing so other than the initial traffic violation that prompted the stop in the first place." Id. (citing Royer, 460 U.S. at 500). Thus, "a prolonged automobile stop requires either the driver's consent or a '***reasonable suspicion***' that illegal activity is afoot." Id. (citing Foreman, 369 F.3d at 781) (internal citations omitted) (emphasis added).

The reasonable suspicion standard is governed by the United States Supreme Court's decision in Terry v. Ohio, 392 U.S. 1 (1968) and its progeny. "Terry's 'reasonable suspicion' standard is 'less demanding . . . than probable cause.'" Id. (citing Illinois v. Wardlow, 528 U.S. 119, 123 (2000). In order to justify a Terry stop, "a police officer must simply point to 'specific and articulable facts, which taken together with rational inferences from those facts,' evince 'more than an 'inchoate and unparticularized suspicion or hunch' of criminal activity.'" Id. (quoting Terry, 392 U.S. at 21; and Wardlow, 528 U.S. at 124 (quoting Terry, 392 U.S. at 27)).

In summary, the Fourth Circuit stated in Branch "[i]f a police officer observes a traffic violation, he is justified in stopping the vehicle for long enough to issue the driver a citation and ***determine that the driver is entitled to operate his vehicle***. The driver's consent or ***reasonable***

*suspicion of a crime* is necessary to extend a traffic stop for investigatory purposes. In order to demonstrate reasonable suspicion, a police officer must offer 'specific and articulable facts' that demonstrate at least 'a minimal level of objective justification' for the belief that criminal activity is afoot." Branch, 537 F.3d at 337 (quoting Wardlow, 528 U.S. at 123; Terry, 392 U.S. at 21).

Furthermore, the Fourth Circuit Court of Appeals in United States v. Bowman, 884 F.3d 200 (4th Cir. 2018) stated "[t]he Fourth Amendment permits an officer to conduct an investigation *unrelated* to the reasons for the traffic stop as long as it '[does] not lengthen the roadside detention.'" Bowman, 884 F.3d at 210 (quoting Rodriguez v. United States, 135 S. Ct. 1609, at 1614 (2015); *see* United States v. Hill, 852 F.3d 377, at 382 (4th Cir. 2017) ("While diligently pursuing the purpose of a traffic stop, officers also may engage in other investigative techniques unrelated to the underlying traffic infraction . . . only as long as that activity does not prolong the roadside detention for the traffic infraction."). For example, "police *during the course of a traffic stop* may question a vehicle's occupants on topics unrelated to the traffic infraction, *see* Arizona v. Johnson, 555 U.S. 323, 333 (2009), or perform a dog sniff around the outside of a vehicle, *see* Caballes, 543 U.S. at 409, as long as the police do not 'extend an otherwise-completed traffic stop in order to conduct' these unrelated investigations." Bowman, 884 F.3d at 210 (citing United States v. Williams, 808 F.3d 238, at 245-46 (4th Cir. 2015) (internal quotation marks omitted).

Further pertinent to the case and facts at hand, the Fourth Circuit has stated that a "motorist stopped by police is obliged to endure 'certain negligibly burdensome precautions' that may not relate directly to the reason for the traffic stop, such as checking whether the driver has a criminal record or outstanding warrants." United States v. Palmer, 820 F.3d 640, 651 (4th Cir.

2016) (quoting <u>Rodriguez</u>, 135 S. Ct. at 1616). An officer, however, "cannot investigate 'a matter outside the scope of the initial stop' unless he receives the motorist's consent or develops reasonable, articulable suspicion of ongoing criminal activity." <u>Palmer</u>, 820 F.3d at 649-50 (quoting <u>United States v. Digiovanni</u>, 650 F.3d 498, at 507 (4th Cir. 2011).

Finally, "although an officer may extend a traffic stop when he possesses reasonable suspicion, he cannot search the stopped vehicle unless he obtains consent, secures a warrant, or develops probable cause to believe the vehicle contains evidence of criminal activity." <u>Palmer</u>, 820 F.3d at 650 (citing <u>United States v. Baker</u>, 719 F.3d 313, 319 (4th Cir. 2013). A "trained drug dog's alert on the vehicle" is sufficient to establish probable cause. <u>Id.</u> (citing <u>United States v. Kelly</u>, 592 F.3d 586, 592 (4th Cir. 2010).

**B.  The undersigned finds Officer Lopez had the necessary reasonable, articulable suspicion to extend the traffic stop beyond the reason for its inception to allow for a K-9 to arrive on scene and conduct a sniff of the Defendant's vehicle.**

Here, upon approaching the vehicle after initiating the traffic stop for an invalid inspection sticker, Deputy Lopez immediately began to conduct the stop by asking for routine information such as the names of the occupants of the vehicle, and the driver's license, registration, and insurance of the driver, the Defendant Cody Boley. *See* <u>United States v. Branch</u>, 537 F.3d 328, 335 (4th Cir. 2008) (quoting <u>United States v. Foreman</u>, 369 F.3d 776, at 781 (4th Cir. 2004)).  Deputy Lopez immediately noticed that the Defendant was very nervous, confused, and was "picking at scabs." Deputy Lopez, in his training and experience as a law enforcement officer, recognized this behavior as typically being associated with users of methamphetamine. (1:18:15-25).

The Defendant, Mr. Boley initially provided Deputy Lopez with a false name, stating his name was "Harley." Upon the Defendant providing Deputy Lopez with the correct name of Cody

Boley, Deputy Lopez then learned that not only was the vehicle not legally operable on the road because it lacked a valid West Virginia inspection sticker, but also that Mr. Boley did not have a valid driver's license and could not operate the vehicle legally. Due to both of these factors, the lack of inspection sticker and lack of a valid driver's license, Deputy Lopez determined that the vehicle would need to be towed. Hence, based on these circumstances alone, it was reasonable for Deputy Lopez to extend the traffic stop. *See* Branch, 537 F.3d at 336 ("if the ***driver obstructs the police officer's efforts in any way - - - for example, by providing inaccurate information - - a longer traffic stop would not be unreasonable***.") (quoting United States v. Sharpe, 470 U.S. 675, 687-88 (1985) (emphasis added)).

Furthermore, upon his initial contact with the occupants of the vehicle, Deputy Lopez observed a "lockbox" in the front middle area of the vehicle. Deputy Lopez testified that in his experience as a law enforcement officer, individuals travelling with a lockbox often have illegal substances or cash related to drug transactions stored in the lockbox. (1:41:50 – 1:42:08).

As is routine and within the permissible scope of a traffic stop, Deputy Lopez immediately and without unnecessary delay, called in information to dispatch on occupants of the vehicle for a "NCIC" check for criminal records and outstanding warrants. United States v. Palmer, 820 F.3d 640, 651 (4th Cir. 2016) (quoting Rodriguez, 135 S. Ct. at 1616). Deputy Lopez ordered the occupants to step out of the vehicle as is also legally permissible for officer safety. *See* Md. v. Wilson, 519 U.S. 408, 415 (1997) (police officers conducting a traffic stop may order the driver and "passengers to get out of the car pending completion of the stop.").

Further, during the stop, Deputy Vanmeter was advised by passenger Robert ("Bobby") Dennison that a firearm was present in the vehicle and the Officer's removed it from the vehicle upon the consent of Mr. Boley. (1:42:33 – 50) (1:43:45 – 55). It was later discovered during the

stop, that Robert ("Bobby") Dennison had also initially lied to the officers about his identification, providing them with a false name. Throughout this time, Deputy Lopez and officers on scene were still waiting for the NCIC information regarding the occupants' criminal history and status of any outstanding arrest warrants to come back. The officers later discovered that there was a "capias" out for Mr. Dennison's arrest from Harrison County (1:50:45 – 1:51:40).

Given these circumstances, the undersigned finds that Officer Lopez conducted the traffic stop in a diligent manner and formed a reasonable, articulable suspicion that ongoing criminal activity was afoot during the natural course of the stop.

### C. Objective facts forming the basis of Deputy Lopez's reasonable, articulable suspicion to extend the traffic stop beyond the reason for its inception.

Deputy Lopez's reasonable, articulable suspicion of criminal activity to extend the stop beyond the reason for its inception and to allow for a K-9 unit to arrive was based on the following objective facts: (1) Deputy Lopez stopped the Defendant's vehicle because it lacked a valid West Virginia inspection sticker and observed it had a "dollar bill" where an inspection sticker should have been located; (2) The driver, Defendant Cody Boley did not have a valid driver's license, and due to the lack of an inspection sticker and a valid driver's license, the vehicle would have to remain on scene until it could be towed; (3) The driver, Defendant Cody Boley provided a false name; (4) Mr. Boley was nervous, confused, never took off his sunglasses, and was "picking scabs"; (5) Deputy Lopez observed a lockbox in plain view upon his initial encounter with the occupants of the vehicle; (6) Deputy Lopez recognized the presence of the lockbox and the behavior of the Defendant as consistent with illegal drug use or drug trafficking; (7) Officers were advised by occupant of the vehicle, Robert Dennison, that a firearm was present in the vehicle and in fact, located and removed the firearm from the vehicle; and (8)

Occupant Robert Dennison also provided a false name to Officers and was later found to have an active arrest warrant.

Therefore, given the totality of all of the above circumstances, and when considering the vehicle could not be legally operated due to the lack of a valid inspection sticker, the undersigned finds that it was reasonable to extend the stop beyond the reason for its inception to allow a K-9 to arrive on scene. The undersigned further finds that Deputy Lopez's actions and conduct during the stop were reasonable and did not exceed the scope of investigation allowed under Terry and its progeny. Hence, the undersigned finds Deputy Lopez possessed the necessary reasonable, articulable suspicion of criminal activity to extend the traffic stop.

**D. The undersigned finds Officer Lopez had probable cause to search the Defendant's vehicle.**

"Although an officer may extend a traffic stop when he possesses reasonable suspicion, he cannot search the stopped vehicle unless he obtains consent, secures a warrant, or develops probable cause to believe the vehicle contains evidence of criminal activity." Palmer, 820 F.3d at 650 (citing United States v. Baker, 719 F.3d 313, 319 (4th Cir. 2013). A "trained drug dog's alert on the vehicle" is sufficient to establish probable cause. Id. (citing United States v. Kelly, 592 F.3d 586, 592 (4th Cir. 2010).

Here, the undersigned finds the positive alert of the K-9 to the presence of controlled substances on the Defendant's vehicle provided Deputy Lopez and the officers on scene with the requisite probable cause to conduct a search of the Defendant's vehicle.

**E. Even if the length of the stop was found to be unreasonable, the undersigned finds the inevitable discovery doctrine would apply because the vehicle would have been towed and an automobile inventory search would have been conducted.**

Under the inevitable discovery exception to the exclusionary rule, evidence that may be illegally seized is nonetheless admissible if the government can prove "by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means." Nix. v. Williams, 467 U.S. 431, 444 (1984). A routine inventory search policy may serve as the basis for the admission of evidence under the inevitable discovery doctrine. United States v. George, 971 F.2d 1113, 1121 (4th Cir. 1992). For an inventory search to be valid, "the search must have be[en] conducted according to standardized criteria, such as a uniform police department policy, and performed in good faith." United States v. Matthews, 591 F.3d 230, 235 (4th Cir. 2009).

Here, while the parties did not argue or brief this particular issue, the undersigned finds it would apply if the length of the stop were to be found unreasonable contrary to the undersigned's recommendation. Deputy Lopez testified Mr. Boley and the occupants of the vehicle were "not free to leave" because he did not have a driver's license and the vehicle was not legally permitted to operate on the road because it did not have an inspection sticker. (1:20:00-1:20:25). Further, as a result of the lack of a driver's license and not having an inspection sticker, Deputy Lopez stated that the vehicle would be "towed." As a result, the undersigned finds it is likely that an inventory search would have been conducted on the vehicle by the Lewis County Sheriff's Department. Therefore, the evidence seized because of the search following the K-9's positive alert during the traffic stop would have been inevitably discovered by the Lewis County Sheriff's Department.

**F.  The undersigned finds that the Defendant's statements during the traffic stop were made while he was not in custody and his statements to ATF agents in an interview five days later were knowing and voluntary based upon a valid waiver of his *Miranda* rights.**

The United States Supreme Court held in Berkemer v. McCarty, 468 U.S. 420 (1984) that an individual's statements made to police officers at the time of a traffic stop were

admissible even though a police officer failed to recite his constitutional rights because the individual was not in custody until formally arrested. Furthermore, the Court found that the "aspects of the interaction" between the police officer and the individual at the scene of the stop would support the contention that the individual was exposed to a custodial interrogation that would require *Miranda* warnings. Berkemer, 468 U.S. at 442.

Similarly, here, the Defendant was not under a custodial arrest nor would the circumstances indicate a custodial interrogation was taking place during the traffic stop of the Defendant that would have required Deputy Lopez to provide the Defendant with *Miranda* warnings. Furthermore, prior to an interview with ATF agents five days after the traffic stop, the Defendant was informed of his *Miranda* rights and executed a written waiver of the same. Therefore, the undersigned finds his statements during this interview were both knowing and voluntary and the Defendant's contention that these statements should be suppressed as a violation of the Defendant's *Miranda* rights is without merit.

## VI.    CONCLUSION

Therefore, for the reasons set forth herein, the undersigned **RECOMMENDS** Defendant's Motion to Suppress (ECF No. 322) be **DENIED**.

Any party may, **on or before Friday, February 22, 2019**,[2] file with the Clerk of Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be

---

[2] "Although parties are typically given fourteen days to respond to a Report and Recommendation, see 28 U.S.C. § 636(b)(1), this allowance is a maximum, not a minimum, time to respond, and the Court may require a response within a shorter period if exigencies of the calendar require. United States v. Barney, 568 F.2d 134, 136 (9th Cir.1978)." United States v. McDaniel, 1:16-CR-52 (ECF No. 32 at 14-15, at footnote). See also United States v. Cunningham, 2011 WL 4808176, at Footnote 1 (N.D. W. Va., Oct. 6, 2011) and United States v. Mason, 2011 WL 128566, at Footnote 7 (N.D. W.Va., Jan. 7, 2011). In this case, the final pretrial conference is set before the Honorable District Judge Thomas S. Kleeh on March 5, 2019 and Jury Selection and Trial is set for March 12, 2019. The resulting calendar exigency thus warrants shortening the period with which to file objections to the Report and Recommendation from fourteen (14) days to seven (7) days.

submitted to the Honorable Thomas S. Kleeh, United States District Judge. Failure to timely file objections to this Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon the Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 717 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208; Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of Court is **DIRECTED** to provide a Copy of this Report and Recommendation to counsel of record, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

Respectfully submitted this 15th day of February 2019.

MICHAEL JOHN ALOI
UNITED STATES MAGISTRATE JUDGE